1

2

3

4

5

6                           **UNITED STATES DISTRICT COURT**

7                           **EASTERN DISTRICT OF CALIFORNIA**

8

9    RONALD MENDEZ,                          )    1:13-cv-00914 AWI GSA HC
                                             )
10                Petitioner,                )    FINDINGS AND RECOMMENDATION
                                             )    REGARDING RESPONDENT'S MOTION TO
11                                           )    DISMISS THE PETITION
                                             )
12          v.                               )    [ECF No. 12]
                                             )
13                                           )
                                             )
14   JAMES D. HARTLEY, Warden,               )
                                             )
15                Respondent.                )
                                             )
16   _____)

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                                   **BACKGROUND**

20          Petitioner is currently in the custody of the California Department of Corrections pursuant to a

21   judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial

22   on November 18, 1993, of multiple counts of forcible rape and forcible oral copulation, and one count

23   of kidnapping with the intent to rape.  Allegations that he was armed with a deadly and dangerous

24   weapon and kidnapped for the purpose of committing a sexual offense were found true.  Petitioner was

25   sentenced to serve a determinate term of 166 years and four months in state prison.

26          Petitioner appealed to the California Court of Appeal, Fifth Appellate District.  On October 27,

27   1995, the appellate court affirmed the judgment.  Petitioner then sought review in the California

28   Supreme Court.  Review was denied on January 31, 1996.

Petitioner then filed three post-conviction collateral challenges with respect to the judgment in the state courts, all petitions for writ of habeas corpus, as follows[1]:

1.    Tulare County Superior Court
      Filed: August 6, 2012;
      Denied: August 13, 2012;

2.    California Court of Appeal, Fifth Appellate District
      Filed: August 22, 2012;
      Denied: October 31, 2012;

3.    California Supreme Court
      Filed: January 20, 2013;
      Denied: April 17, 2013.

On June 17, 2013, Petitioner filed the instant petition.  On July 22, 2013, the Court screened the petition and determined that Ground One did not present a federal claim.  The Court further determined that Grounds Two and Three were conclusory and unsupported.  Therefore, the Court dismissed the petition and granted Petitioner leave to file an amended petition with respect to Grounds Two and Three.  Petitioner filed an amended petition on August 21, 2013.  On October 17, 2013, Respondent moved to dismiss the petition for violation of the statute of limitations.  On November 12, 2013, Petitioner filed an opposition.  Respondent filed a reply to the opposition on November 19, 2013.

**DISCUSSION**

A.  Procedural Grounds for Motion to Dismiss

Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

The Ninth Circuit has allowed respondents to file a motion to dismiss in lieu of an answer if the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the state's procedural rules.  See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d

---

[1] Pursuant to the mailbox rule, the Court deems the petitions filed on the dates they were signed by Petitioner and presumably handed to prison authorities for mailing.  Rule 3(d) of the Rules Governing Section 2254 Cases; Houston v. Lack, 487 U.S. 266, 276 (1988); Huizar v. Carey, 273 F.3d 1220, 1222 (9th Cir. 2001).

2

599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for state procedural default); <u>Harrison v. Galaza</u>, 1999 WL 58594 (N.D. Cal.1999) (using Rule 4 to review motion to dismiss for statute of limitations violation).  Thus, a respondent can file a motion to dismiss after the Court orders a response, and the Court should use Rule 4 standards to review the motion.  <u>See</u> <u>Hillery</u>, 533 F. Supp. at 1194 & n. 12.

In this case, Respondent's motion to dismiss is based on a violation of 28 U.S.C. 2244(d)(1)'s one-year limitations period.  Because Respondent has not yet filed a formal answer, the Court will review Respondent's motion to dismiss pursuant to its authority under Rule 4.

B.  Limitation Period for Filing a Petition for Writ of Habeas Corpus

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA").  The AEDPA imposes various requirements on all petitions for writ of habeas corpus filed after the date of its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Jeffries v.</u> <u>Wood</u>, 114 F.3d 1484, 1499 (9th Cir. 1997).

In this case, the petition was filed on June 17, 2013, and therefore, it is subject to the provisions of the AEDPA.  The AEDPA imposes a one-year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  As amended, § 2244, subdivision (d) reads:

> (1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

1        (2) The time during which a properly filed application for State post-conviction
2     or other collateral review with respect to the pertinent judgment or claim is pending
      shall not be counted toward any period of limitation under this subsection.

3   28 U.S.C. § 2244(d).

4        In most cases, the limitations period begins running on the date that the petitioner's direct

5   review became final.  In this case, the petition for review was denied by the California Supreme Court

6   on January 31, 1996.  Thus, direct review concluded on April 30, 1996, when the ninety (90) day

7   period for seeking review in the United States Supreme Court expired.  Barefoot v. Estelle, 463 U.S.

8   880, 887 (1983); Bowen v. Roe, 188 F.3d 1157, 1159 (9th Cir.1999).  Petitioner had one year until

9   April 30, 1997, absent applicable tolling, to file his federal petition for writ of habeas corpus.

10  Patterson v. Stewart, 251 F.3d 1243, 1245 (9th Cir.2001).  However, Petitioner delayed filing the

11  instant petition until June 17, 2013, over sixteen years beyond the due date.  Absent any applicable

12  tolling, the instant petition is barred by the statute of limitations.

13        1.  Tolling of the Limitation Period Pursuant to 28 U.S.C. § 2244(d)(2)

14        Title 28 U.S.C. § 2244(d)(2) states that the "time during which a properly filed application for

15  State post-conviction or other collateral review with respect to the pertinent judgment or claim is

16  pending shall not be counted toward" the one year limitation period.  28 U.S.C. § 2244(d)(2). In Carey

17  v. Saffold, the Supreme Court held the statute of limitations is tolled where a petitioner is properly

18  pursuing post-conviction relief, and the period is tolled during the intervals between one state court's

19  disposition of a habeas petition and the filing of a habeas petition at the next level of the state court

20  system. 536 U.S. 214, 215 (2002); see also Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999).

21        As stated above, the statute of limitations ran from May 1, 1996, to April 30, 1997.  Petitioner

22  did not file any state habeas petitions within the limitations period.  Petitioner did file three state

23  habeas petitions commencing on August 6, 2012, but the limitations period had already expired fifteen

24  years earlier.  Therefore, those state petitions had no tolling consequences.  Jiminez v. Rice, 276 F.3d

25  478, 482 (9th Cir.2001) (Petitioner is not entitled to tolling where the limitations period has already

26  run); see also Webster v. Moore, 199 F.3d 1256, 1259 (11th Cir.2000).  Moreover, the first state

27  habeas petition was denied with citation to In re Robbins, 18 Cal.4th 770, 780 (1998), which signaled

28  an express finding of untimeliness by the state court. See Thorson v. Palmer, 479 F.3d 643, 645 (9th

4

Cir.2007) (California state court's citation to <u>Robbins</u> is a "clear ruling" of untimeliness).  A petition

denied by a state court as untimely is not "properly filed" for purposes of § 2244(d)(2) and therefore

cannot operate to toll the statute of limitations.  <u>Pace v. DiGuglielmo</u>, 544 U.S. 408 (2005); <u>Bonner v.

Carey</u>, 425 F.3d 1145, 1149 (9th Cir.2005).  The two subsequent state habeas petitions were summarily

denied; therefore, it must be assumed that they were denied as untimely as well.  <u>Pham v. Terhune</u>,

400 F.3d 740, 742 (9th Cir.2005); <u>Shackleford v. Hubbard</u>, 234 F.3d 1072, 1079 n.2 (9th Cir.2000)

(citing <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).  Accordingly, Petitioner is not entitled to

statutory tolling and the federal petition remains untimely.  28 U.S.C. § 2244(d).

### 2.  Equitable Tolling

The limitations period is subject to equitable tolling if the petitioner demonstrates: "(1) that he

has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his

way." <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 418 (2005); <u>see also</u> <u>Irwin v. Department of Veteran

Affairs</u>, 498 U.S. 89, 96 (1990); <u>Calderon v. U.S. Dist. Ct. (Kelly)</u>, 163 F.3d 530, 541 (9th Cir. 1998)

(citing <u>Alvarez-Machain v. United States</u>, 107 F.3d 696, 701 (9th Cir. 1996), *cert. denied*, 522 U.S.

814 (1997)).  Petitioner bears the burden of alleging facts that would give rise to tolling. <u>Pace</u>, 544

U.S. at 418; <u>Smith v. Duncan</u>, 297 F.3d 809 (9th Cir.2002); <u>Hinton v. Pac. Enters.</u>, 5 F.3d 391, 395

(9th Cir.1993).  Here, Petitioner does not argue that he should be entitled to equitable tolling, and the

Court finds no reason to grant equitable tolling.

### 3.  Actual Innocence

In his opposition, Petitioner claims he is actually innocent of the crimes.  He argues that actual

innocence is an exception to the statute of limitations and therefore the Court must consider the merits

of his claims.  Petitioner cites to the recent Supreme Court decision in <u>McQuiggin v. Perkins</u>, wherein

the Supreme Court held that "actual innocence, if proved, serves as a gateway through which a

petitioner may pass" where the impediment is, inter alia, the expiration of the statute of limitations.

<u>McQuiggin v. Perkins</u>, 133 S. Ct. 1924, 1928 (2013).  However, the Supreme Court cautioned "that

tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold

requirement unless he persuades the district court that, in light of the new evidence, no juror, acting

reasonably, would have voted to find him guilty beyond a reasonable doubt.'" <u>Id</u>. (citing <u>Schlup v.

1    Delo, 513 U.S. 298, 329 (1995); see also House v. Bell, 547 U.S. 518, 538 (2006) (emphasizing that

2    the Schlup standard is "demanding" and seldom met).  Further, the Supreme Court held that "[t]o be

3    credible, such a claim requires petitioner to support his allegations of constitutional error with new

4    reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or

5    critical physical evidence—that was not presented at trial."  Schlup, 513 U.S. at 324.  In addition,

6    "'the timing of the [petition]' is a factor bearing on the 'reliability of th[e] evidence' purporting to

7    show actual innocence."  Schlup, 513 U.S. at 332.  As Respondent correctly argues, the facts[2] of

8    Petitioner's case refute his claim of actual innocence:

9        On September 30, 1992, around 5:30 a.m., victim Mary Jo L. (hereinafter "L.") was
10       jogging alone near her residence in Tulare County. As it was beginning to become
         daylight outside, sometime between 6:15 and 6:30 a.m., L. ran past the intersection of
11       Whitendale and Akers and continued west on Whitendale to a dirt road that passed
         through a kiwi orchard. As she ran in the orchard, she heard an automobile approaching
12       from behind. The vehicle, a pickup truck, moved slowly towards her and then stopped.
         Appellant exited; L. assumed he was a farmer. She continued to run, looked back, and
13       saw appellant approaching on foot.

14       Appellant eventually grabbed L. He was holding a large knife, possibly a butcher knife.
         The two scuffled and appellant told L. to "shut the fuck up" when she screamed. He
15       then stated to L. that "I've killed before, and I'll kill you if you don't shut the fuck up."
         He then told her he was going to "fuck" her. Because she was afraid, L. made a
16       decision to comply with appellant's demands. During the scuffle, L. received a cut on
         her finger and nose, and bruises on her face.

17       L. testified she was so afraid she urinated in her running shorts. She was unable to
18       recall whether she or appellant removed her shorts. Appellant instructed L. not to look
         at him and told her to lie on the ground and do what he wanted. She complied, and
19       continued to see the knife in appellant's hand.

20       The first rape occurred at this time. Appellant did not ejaculate. He also had L. orally
         copulate him, and again did not ejaculate. A second rape and oral copulation then
21       occurred, still without ejaculation by appellant. L. testified that at least four sexual acts
         occurred at this location on the dirt road.

22       As daylight continued to approach, L. attempted to convince appellant to release her;
23       she said she needed to go home to be with her children. In response, appellant told her
         she was going to go with him and that if she tried to escape he would kill her. L. was
24       forced to enter appellant's pickup truck. He then drove the truck out of the orchard and
         continued on to an unknown location.

25       As appellant drove the truck, he demanded that L. orally copulate him. Appellant drove
26       the pickup for about 20 to 25 minutes and the forced oral copulation continued on and

27   _____

28   [2] The Fifth District Court of Appeal's summary of the facts in its October 27, 1995, opinion is presumed correct. 28 U.S.C.
     §§ 2254(d)(2), (e)(1).

                                                         6

off throughout this period. She attempted to stop the oral copulation a minimum of three times in order to breathe, only to have her head pushed down by appellant.

Appellant ultimately stopped the truck in a deserted field. He again told L. that she had to comply with his wishes if she wanted to live, and that she had better listen to him. Appellant raped her on the front seat of the truck, and again did not ejaculate. Another act of forced oral copulation took place. She testified that this pattern (rape then oral copulation) occurred a minimum of three times and a maximum of four.

Appellant told L. she was a nice person, apologized for violating her and then proceeded to tell her about his life. Appellant told L. he was from Peru, his mother had something terrible happen to her that he witnessed when he was young, and that he felt no one loved him. He also told her he liked to cook. Appellant smoked a cigarette and continued his apologies. He asked L. why she didn't drive him to the police station and turn him in. He did not reply when L. asked if that's what she wanted her to do. When appellant was finished with his cigarette, he demanded more oral sex and had L. remain performing the act until he ejaculated.

L. asked appellant to take her somewhere, and realizing she was in Kings County, asked him to drop her off. He stated he was concerned that if she returned to Visalia, he would be captured. Appellant stopped the vehicle, and L. exited and ran to the nearest house, approximately one-fourth mile away. At the first house where she stopped, the occupants did not speak English. The second house, on Second Avenue in Hanford, was approximately two miles south of Highway 198 and about one-eighth mile from the first house. She told the occupants, Mary and Manuel Bettencourt, what had taken place, and they notified authorities. Approximately three hours had passed since appellant first approached L.

Kings County Sheriff's Department Deputy Constantine responded to the call and arrived at the Bettencourt residence at about 10 a.m. Constantine interviewed L. and learned that she had been sexually assaulted and abducted. Her clothing and the back of her legs were very dirty. She had a deep cut on her left middle finger and a scrape or cut on her nose. He also described her lips as swollen and her eyes as puffy or swollen. L. described her assailant as being a male Hispanic about five feet nine inches tall with coarse black hair combed straight back. His weight was estimated at 175 pounds and he had a medium build. She further told the deputy her assailant was barefoot, had dirty feet, and smelled of alcohol.

L. said she was held on the ground with a knife at her throat and told to "shut up." Her assailant told her "I've killed before, and I'll kill again." Before they left the location of the initial assault, she was told "We're going to go somewhere else and finish this." Her assailant spoke in fairly good English, but mumbled some words she believed were in Spanish.

L. described the truck in which she was abducted as a Chevrolet pickup of 1980's vintage. It was blue, gray, or blue-gray in color, and had words "Custom Deluxe" on the dashboard. The interior was described as very dirty, and littered with papers and beer cans. A quilt or blanket and license plate were also in the cab of the truck. L. did not state whether the glove box was missing or if the windshield was cracked.

L. was taken to Visalia Community Hospital and examined by Dr. King between 11:15 and 11:30 a.m. She was described as appearing distraught and traumatized but coherent. A small laceration was observed on her nose, and a deep laceration was found on her left middle finger. The latter was described as being approximately three-fourths

of an inch long; it required stitches. L. also had an abrasion to her left shoulder, bruising on her left thigh, dirt in her vagina, and pubic hair near her cervix. The examination found no evidence of semen.

Visalia Police Department Detective Shear sent a crime scene technician and investigator to the orchard where the assault began, which was located 100 to 150 yards from the intersection of Akers and Whitendale and approximately 10.2 miles from the residence of the Bettencourts. The drive between the two locations took 15 to 20 minutes. Shear's investigation revealed that "Custom Deluxe" was a logo on the dashboard of Chevrolet pickups between the years 1973 and 1980.

There was also testimony from Karen T. (hereinafter "T."). Like L., T. was a jogger. T. ran approximately three and one-half miles after work. On June 24, 1993, T. was running in Napa County through the intersection of Golden Gate and Foster Road. The intersection is in a rural area without housing immediately around it. She described the area as being composed of cattle ranches. Her run began between 8:20 and 8:30 p.m. She was accompanied by her dog. After running 10 to 15 minutes, and prior to reaching the intersection, she saw a man laying on the side of the road propped on his elbows. The two were about 30 feet apart; he was looking at her. She ran to the other side of the road, only to have the individual jump up and start running in her direction. He caught her and grabbed her by her T-shirt. He held a large knife, similar to a butcher knife, to her face. The man made a statement to T., pulled her off the road towards some bushes, and ordered her to let go of the dog leash. When she refused, he cut the leash. He pushed her into the bushes, tore open her T-shirt, threw her down, and climbed on top of her.

When she heard a car nearby, T. began to struggle and scream. The individual covered her mouth and nose with his hand and asked her if she was going to be quiet. When she said she would, he stated that she was "really fucken pissing me off." Again, he held the knife up and asked her if she wanted him to poke her eyes out or cut her face or kill her. He then told her he wanted her, and said that they were going to go somewhere. When she indicated she did not want to go, he stated "We're going to party."

T. rose and attempted to escape but was caught again, fell, and was pulled into the bushes. Once more they struggled and when T. heard a second car, or possibly a motorcycle, the assailant again covered her nose and mouth and kept telling her she "was fucken pissing him off." T. was struck in the face by her attacker and again told that he wanted to leave. She felt the man run his hand down her side as he told her she was fine and that they were going to have a good time.

T. was taken toward the road. She saw a car and again tried to escape. The attacker threw T. down and struck her at least twice. He then picked her up, put her over his shoulder, and ran to a car parked in the driveway. He placed her in the trunk with her legs dangling out. When he attempted to push T.'s legs in the trunk, he became angry and hit T. in the head. T. saw a bicyclist passing by and began to scream. The attacker left and T. climbed out of the trunk and ran toward two people. The attacker fled in the automobile. T. stated the attacker smelled of alcohol and only spoke English. He was described as clear and demanding.

T.'s face was fractured in numerous places and four fingers on her left hand were cut. One finger was broken. She also had road burns, bruises, and scrapes. The incident was reported to the Napa County Sheriff's Department.

8

T. identified appellant as the assailant at a line-up. Appellant was convicted of the assault on T.

Detective Shear was contacted by Detective Robbins of the Napa County Sheriff's Department in June 1993. The license number of the attempted kidnapper in Napa County had been discovered and appellant had been identified as the perpetrator. Robbins discovered that appellant owned a Chevrolet pickup. Search warrants were issued, and a black Chevrolet pickup truck was seized at the Visalia home of appellant's brother. On the dash of this vehicle was an emblem with the phrase "Custom Deluxe." Inside, officers found an item described as a quilt, blanket, or scarf, two knives, a license plate, and papers bearing appellant's name. Beer cans and cigarette boxes were also strewn inside. The glove box was missing and the windshield was cracked.

L. was shown the seized pickup truck on June 29, 1993, and was 70% sure it was the same vehicle she was forced into. On the same day, she identified appellant at a line-up.

Tire tracks, footprints, and shoe prints were taken from the ground at the orchard where the initial attack of L. had occurred. A broken fingernail was found at the site. The victim's running shoes were the same size and tread pattern as the shoe prints found at the scene. Inked foot impressions of appellant were found to be consistent with the size, shape, and creases of footprints found at the scene. Tire tread impressions from the pickup truck were also found to be consistent with tire tracks found at the scene.

Sandra Lomeli testified she began dating appellant in December 1992, and that appellant lived with his parents in Visalia at that time. He moved to Napa County in 1993, and, in late June of that year, she heard police were looking for him. She asked appellant about this, and he told her he thought they were looking for him because of a fight he had with a girl in Napa. He said the girl had taken money from him and that he wanted it returned. When she refused, he hit her.

Lomeli did not know the police were looking for appellant because of rape charges, and was unaware of this when she took him to the sheriff's department to surrender. When she visited appellant at the jail, he told her about the charges and proclaimed his innocence. However, he later told her he had an affair with a woman, and that on the night of the charged incident, he was with her and they were making love in a car. The woman became upset when appellant told her he had a girlfriend, and threatened him as she left the vehicle.

Lomeli testified that she occasionally did laundry for appellant and found shorts and a T-shirt with what appeared to be blood spots on them. She gave these items to the Visalia Police Department. She also testified to a conversation with appellant at Napa County Jail regarding T., and the incident alleged to have happened on September 30. Appellant told her they had nothing on him, and that his father and cousin would provide an alibi. When she asked him if he had been in Visalia, he replied that he could not tell her because "they" could be listening on the telephone.

Appellant's father, Manuel Mendez, testified in appellant's defense, as did appellant's best friend, Manuel Contreras. According to these two witnesses, appellant did not speak any Spanish, and Spanish was not spoken in appellant's home. Appellant's father testified appellant had had a mustache for the past 7 or 10 years, and that he had never shaved it off during this time. When appellant's father was told blood had been found in the trunk of the car, and that the automobile had been identified as the vehicle used in the attack in Napa, he testified the blood must have come from a rabbit. He further

testified his brother had been rabbit hunting. He admitted being present when appellant testified in Napa, but said he did not recall appellant stating appellant spoke very little Spanish, knowing only a few words in that language. With regard to the knives found in the truck, both belonged to Lomeli and were placed in the vehicle, under the seat, in March 1993.

Stella Villanueva testified she knew appellant and his wife, Sandra Huerta. The two were undergoing a divorce in September or October 1992. She was with Huerta on October 1, 1992, and saw appellant. San Joaquin County court documents show appellant and Huerta appeared in court at 8:30 a.m. that day. The proceeding involved the divorce and a restraining order against appellant. Villanueva and her husband had gone to the residence appellant shared with Huerta and saw appellant there the previous morning between 7:45 and 8:15 a.m. She overheard appellant tell Huerta that he would see her in court the next day, and that he was hiring an attorney.

Appellant's investigator, Cliff Webb, took a taped statement from Villanueva. She told him she went to appellant's residence on Sunday night, but also said she could not recall if it was Sunday or Monday when she went there. She stated she visited Huerta and appellant in the morning. She said she hadn't really changed her story, but was just confused about the day. She testified, however, that she had been with Huerta on a Wednesday and visited appellant and Huerta the Tuesday before. She checked Huerta's court papers and the calendar and concluded Wednesday was the court day. Nevertheless, her initial statement was that she had visited Huerta and appellant on Tuesday night, later changing the time to Tuesday morning.

(Lodged Document No. 2.)

In this case, Petitioner contends he received newly discovered evidence in the form of an affidavit from his ex-wife establishing that Petitioner appeared in court in a divorce proceeding in another county just hours after the crimes occurred. As noted by Respondent, however, the evidence is not "newly discovered" and it is by no means exculpatory such that this Court could find that no reasonable juror would have found him guilty beyond a reasonable doubt. First, Petitioner does not submit the affidavit or describe how he received it. Second, it is clear the evidence was known and in fact presented at trial. As set forth in the appellate court's opinion recited above, the defense called Stella Villanueva as a witness. Ms. Villanueva testified that she saw Petitioner and his ex-wife on October 1, 1992, after the divorce court proceeding Petitioner refers to in his opposition. As noted by the appellate court, San Joaquin County court documents show Petitioner appeared with his wife at 8:30 a.m. on Thursday, October 1, 1992. The rape, however, occurred in the early morning hours of Wednesday, September 30, 1992. Villanueva testified that she had seen Petitioner with his ex-wife on the previous morning, which would have been the date of the rape, around 7:45 a.m. to 8:15 a.m., and she overheard Petitioner state he would see his wife at court the following day. However, her initial

10

statement to Petitioner's investigator was that she had seen Petitioner and his ex-wife on the Tuesday night, later changing the time to Tuesday morning.  Therefore, the evidence Petitioner offers as "newly discovered" was known at the time of trial and was in fact presented to the jury through Villanueva. Petitioner's failure to state why he only recently procured his ex-wife's statement, in conjunction with the fact that the evidence was already known and presented at trial, severely undermines its reliability. Further, the evidence does not show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.  It was clearly rejected by the jury, and it does not refute the overwhelming evidence collected and presented at trial, including eyewitness accounts.  The evidence does not call into question the reliability of his conviction.  Petitioner fails to demonstrate actual innocence, and should not pass through the <u>Schlup</u> gateway and avoid the statute of limitations.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that Respondent's motion to dismiss the petition be GRANTED and the petition for writ of habeas corpus be DISMISSED with prejudice for violating the statute of limitations.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, either party may file written objections with the Court.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 11, 2013**          _____**/s/ Gary S. Austin**_____
                                             UNITED STATES MAGISTRATE JUDGE